Case number 22-1332, et al. NCRNC, LLC, doing business as Northeast Center for Rehabilitation and Brain Injury Petitioner v. National Labor Relations Board. Ms. Lanouette for the petitioner, Mr. Weitz for the respondent. Whenever you're ready. Good morning, your honors. This case arises out of a union organizing campaign at a long-term care center specific for individuals with traumatic brain injury. And that's important because the board erred in finding that NCRNC's instruction to its supervisors was surveillance and that they committed surveillance, especially in the healthcare context. The Supreme Court has said healthcare is in patient areas, in patient locations is entitled to have stricter rules than maybe would exist in other places and areas. The board found surveillance, uncharged conduct, by the way, in two areas, the manager on duty program that the Northeast Center ran and in handing out of flyers by supervisors to employees. Let's just stipulate that Section 8C protects the flyers. I'm with you on that. But the manager on finding not supported by substantial evidence. You have testimony that they put in place this program. Managers are showing up in weird hours at weird places. And that tends to be that one can easily imagine that's intimidating to employees. It might be intimidating if they were showing up in break rooms and parking lots and places where union organizing activity generally occurs. That was never the instruction. Nobody testified to that. The instruction was to come in and to monitor workplaces, patient care areas, the units for the unit managers and department heads to monitor employees. And her specific testimony was we were told to look to make sure employees were doing their jobs. Was it just you? I thought it was not just unit managers. It went all the way up to Mr. Weir. Mr. Weir had started his program in July. There is evidence in the record the general council submitted emails from Mr. Weir to the other people in the company saying I'm already going to every unit every day. I've been on every shift. I've met with employees. And that was A405. That email was sent July 9th in A403. Him saying we're already doing this. We've started it. They brought in the consultants at that time because the comment heard in the hallway was maybe we should get a union in here. That's all the comment was. There wasn't any more than that. A manager overheard it. And the consultants in July, well before they knew there was a union organizing campaign, suggested they start bringing in supervisors and managers more often. Look, these people were supposed to be there anyway. Was there any rationale given? The employees on the night and evening shift did not have enough contact with their supervisors. The facility was short-staffed. Everybody said that. That was actually one of the precipitating events for union organizing campaign. And that supervisors needed to be doing more to help their employees on the night shift and the evening shift. There would certainly be substantial evidence to support a conclusion that that was the reason for the program and it was perfectly appropriate and perfectly fine. Right? But there's other evidence. I don't think there is. You need to negate the worst evidence. And I don't think there is other evidence. So, I think what I would testify to was to come into our units, which is where they're supposed to supervise anyway, and look to see if employees were doing something suspicious, gathering in groups, and not working. And when the ALJ asked her to clarify what she meant, she said, well, basically we were supposed to look to see if they were working. That's not surveillance. That's doing your job as a supervisor. I mean, it doesn't really challenge the credibility determinations of the ALJ, which were affirmed by the board. And those credibility determinations were overwhelmingly in favor, you know, were against Northeast. And it's obviously a hard standard to rebut credibility determinations. But without any challenge to the credibility determinations, how do we find that there was not substantial evidence here for what the board did? But it's not a, the only evidence is her testimony that this is Tara Golden's testimony. And her testimony was they were to look for employees not doing work on work time. There's no evidence in the record that they went, say, to the break rooms. You know, Springbrook, which the board relies heavily on, the manager comes in and stands outside of a door where they know there's a union meeting and watches people going in and out. That never happened here. There's evidence in the record that even the nurses' station, they were not told to go to the nurses' station even. It just can't be that an especially in a health care setting where there are patients, you can't increase the number of supervisors walking around at some point in time because that's better for the facility. I mean, it's a legal determination whether that's coercive or not. That's not a factual determination. It's a legal one. The legal standard is whether it's coercive, whether it's interfering with union activity. Why isn't it a factual question whether the specific program actions of the supervisors and such would tend to coerce, whatever the verbs in 8A1, coerce, restrain, or interfere? Or interfere. Yeah. So that's a legal conclusion. Can you coerce, restrain, or interfere somebody if the only place that the supervisors are active is in patient care areas during work time? They shouldn't be union organizing there anyway, right? This is patient care areas during work time, not the nurses' station even, not the break rooms, not the parking lots. This is work area work time. It can't be coercive there. It can't be interfering because they're not supposed to be doing it there anyway. They're supposed to be working, caring for these brain-injured patients. Suppose, I don't know, this probably isn't the facts, but suppose Mr. Weir starts showing up, or the CEO of the parent company shows up, making the rounds, poking around. You don't think that might tend to interfere, right? Send a message, we're watching you, we're upset about this, you better be careful. So Mr. Weir is the administrator, he actually was legally required to do rounds on the ship, but you're talking about Mr. Camarota? Yeah, from the... Suppose we bring in outside people and we walk them around and we start following people? I think that's coercive, sure. But that didn't happen here. But managers who are outside the chain of command, a couple steps up the chain of command... They weren't. The unit managers were on their units. The employee who was a union employee testified that her unit manager had been on her unit on all shifts prior to the union organizing, that was normal. The only unit manager that said she'd never been there before was Tara Golden, and the judge found credibility that she did not know what her job was. That was his credibility finding for her. The other people were department heads, but department heads had employees throughout the facility. CSS workers worked on every shift, every floor, so the CSS department head walking around checking on his employees to see if they're working is just supervision. It's nothing more, especially if it's in patient areas. Same thing, now there is a question about department of dietary and housekeeping. Those people were not Northeast employees. Those departments were outsourced, and there was testimony to that, and the ALJ found that, that they were outsourced departments. So the Northeast can't be responsible for what the outsourced departments did with regard to their employees. There wasn't any communication between them and, for instance, Northeast that was in the record. Counsel, I want to go back to Mr. Weir for a moment. You said he began his practice in July. Yes. But it's my understanding that the first hint of union activity was in late June. There was a comment made in July at the nurse's station, maybe we should get a union in here. That was the only comment that was made. The only union activity occurred much later. Remind me, in the record, who recounted that? It was a supervisor walking by who overheard the comment, reported it to Mr. Weir. And that was in late June? That was July 9th. I'm sorry, July what? July 9th. July 9th. And that's when did Weir first begin? Weir began in February. No, no, he was walking through the... In the email on July 9th, he said, in response to a question of, well, why is this the first we're hearing about it? He said, I had already met with all employees on every shift. I've met with them several times. I've been walking through the building on several shifts. He had started well before that. Started working there, you mean, not started... No, he had started his shift walking around, meeting with employees. On the day that they find out that there's this comment about maybe we should talk to a union, he sends an email saying, I've already met with... I've had departmental meetings with staff present. I've been to every unit on every shift numerous times. He says that... I thought you said earlier that his conduct began well before there was any union activity. It did. But not before the first mention of... No, it did. He sends that email saying, I've already done all of that. On the same day they find out about the union, possible union. And the only comment is, maybe we should get a union in here. Not look at a card, not, do you want to come to a meeting? It was just maybe we should get a union in here. In response to a question about being short-staffed that night. That's certainly not helpful, I'm sorry to say. Well, I think, though, if he's saying on July 9th, I've already done this, and that's the first word they have of a union, the manager on duty program is already in place. It's in place because he says, I've already done it. I've been to every shift numerous times. I'm going to take a look at that. It's in the record A403. It was a general counsel exhibit 8. Can I ask about Mr. Endy? Yes. Judge Ginsburg is running that down. One consideration that seems to cut against supervisor status is that the assignment function that he performed when he was the ranking supervisor is a pretty small percentage of his work time. So let me just sketch it out for you, and then I'll let you respond. He takes 15 minutes to do this at the start of his shift. I assume it's, let's say he works an eight hour shift. He's the ranking supervisor two days a week. It's 30 minutes out of 40 hours, one over 80. And there seem to be cases, this wasn't a big part of the board's rationale, but there seem to be cases suggesting that if you're acting as a supervisor part time, you've got to be north of 10%, and he's not. I think he is. I mean, I just gave you 30 minutes out of 40 hours. Why is that the wrong way of thinking about it? So the testimony was that on a good day it took 15 minutes, but typically it took 30 to 45. Typically 30 to 45? I thought it was typically 10 to 15 and occasionally 30. They said, I believe Josie Cruz said it was typically more because of the call outs. And when I asked Mr. Endy about that, he agreed that it was more difficult because they regularly had employees call out. And so they would then have to redo the assignment they had planned for the night. You mean call out, like not show up for work? Yeah, not show up for work. This is a low wage job. It's, you know, the supervisors get additional training, but the employees don't, and so they tend to call out when they don't want to be there. That was one of the problems. Both supervisors also testified that during the shift they would occasionally, or actually Josie Cruz said on a regular basis, have to make- Let's just, before we get to during the shift. So 45 minutes, twice a week, one and a half hours out of 40. You're still- But how different is that from Oakwood Healthcare, where the nurses are assigned at the beginning of the shift? The CNAs are assigned at the beginning of the shift. That's not taking any more time. I thought the nurse in question, like, was a full-time supervisor. Am I wrong about that? I don't think they full-time assigned work, though. And he is a full-time supervisor. I think it's fair to say he's not. Okay, so that's leading to the other point I wanted to ask you, which is he sort of is and he sort of isn't. I mean, he's only doing this assignment when, is it Ms. Cruz is not there? So that was not actually what the record showed. We put in all of the assignment sheets, and more often than not, he made the assignment even if she was there. What is he doing? So on the days, or on the nights when he is doing the assigning, and it takes 15 minutes or 45 minutes, whatever it is, what is he doing after that? Is he just one of, is he just doing CSS line function, or is he actively supervising for his whole shift? He is actively supervising for his whole shift. The supervisor was responsible to walk around and check on employees to see if they weren't doing their work, to see if they had any problems. He would have to deal with a problem if a patient and a CSS were not getting along. He would switch who was taking which job function. And this is all in his testimony. He would give them their breaks. So he would say, okay, it's your break time now. You go on break. I'll cover for you while you're on break. It's your lunch hour, go half hour, go take your lunch half hour. I'll cover this while you're doing that. He responded to codes, code rainbows, a violet patient, he would be there responding to those as a supervisor or whoever was the supervisor. If there was a moon, which was a patient got out of the facility, the CSS supervisor would typically be the person who would go look for them because the night nursing supervisor could not leave the perimeter of the facility. How are those functions supervisory? I mean, those sound like part of the duties of his employment. Well, they're supervisory in that he's helping the night nurse supervisor with the employees who are doing things. Employees deciding when they go on break, deciding when they are, who's working with whom, switching people up. That's all supervisory. Even if some of that requires the independent judgment of a supervisor, why isn't it routine and clerical? I don't think it's routine and clerical because the rule is he has to compare data, right? So deciding that this person is going to be better off on the phones because they have phone experience and computer experience. He said there were three to four who could do that, other people couldn't. Deciding that this employee is not working out with this patient right now and I can pull a different employee and put them in here, it's comparing data, it's making decisions and judgment. I would say that's no different than saying lawyers all have the same training, but the guy who's in jail today representing incarcerated inmates is having a far different day than I am. And the supervisor who assigns it can affect the way their day goes. I mean, it may well have an effect, but that doesn't mean it's not routine and clerical. I mean, the statute sort of envisions that there are circumstances in which someone exercises independent judgment. Right. But their matters are still routine and clerical. So it still has to be something, you know, something other than routine and clerical. But one of the things that the standard says is that it's the ability to affect the employee's work conditions for the night. And that's really the question here. You know, should somebody who can tell you whether or not you're working in a locked unit with violent patients or having to just walk around, check on people sleeping, be able to coerce you into signing a union card? That was the bottom line for this, right? He's a supervisor. He's passing out cards, telling employees they have to sign them. Is it OK in this circumstance for him to do that? And I think the law says it's not because he can affect these employees night to night. He can issue discipline to them and did. He can tell them to go to, you know, this locked unit with violent patients and work there for your night or walk around and not deal with much. It just seems to me that that person shouldn't be able to tell the employees he gets to assign and he gets to discipline, sign this union card. There is an implicit threat there or I'll give you a crappy shift. Right. That's a supervisor. That's why we don't allow them to do that. I see my time is up. OK, thank you. We'll give you some. We'll hear from the board. Good morning, Mr. Weitz. Yes, good morning. May it please the court. Eric Weitz on behalf of the National Labor Relations Board. I'd like to begin just by clarifying one point on the unlawful surveillance finding to your honor's question. The board did not find that the passing out of flyers was a separate unfair labor practice in any way. In fact, the employer had been passing out those flyers throughout this campaign. For example, in the routine course of the day when supervisors were seeing employees, the board did not find that that was unlawful. What the board found was as part of this out of the ordinary change in practice, when all of these senior managers began coming into the facility to observe employees and to interact with them to try to suss out their union sympathies. Part of that was passing out these flyers and observing how they reacted. But the board's ultimate finding was an unlawful surveillance finding based on the unusual and coercive presence of these individuals. Based in part on the managers showing up, managers outside the chain of command showing up in odd places at odd hours. I'll give you that. But part of part of it was the passing out the leaflets. That's correct, your honor, because that was that shows 23 on page 12 of the appendix. The board is talking about surveillance and they say that this one on one interaction when the supervisory employer employees are lawfully passing out literature is part of the surveillance. Because they're not closing their eyes when they lawfully speak to employees. You want to defend that? Well, that's absolutely correct, your honor. But I guess my point is the employer was doing that in a non out of the ordinary way. And the board did not take any issue with that or say that this type of one on one persuasion is unlawful. They're specifically citing this as one of the practices that the managers were doing that highlights how out of the ordinary and coercive this was because it was not about telling employees to do a good job at work. As Miss Golden credibly testified, the entire purpose of this change in policy was about the union campaign to identify and potentially observe union activity and try to suss out individual employees opinions about the union. And so that's why the board found it significant. But as the board clarified in response to dissenting board member Ring, the board's not taking issue with an employer's right to engage in one on one persuasion. One on one persuasion is okay. Correct. And I mean, assuming it's not, you know, done in private places or coercively. The one on one persuasion is okay. And then whatever and assume no interrogation. But if the representative of the employer observes the body language, if the employee volunteers a comment and such, what's your position? Can the manager report that back to senior leaders? I think, I mean, I don't want to take a position for the board, but I'd note that here the board, the employer was doing that in the normal course or in a not coercive way. And the board did not find that that was an unfair labor practice. What the board found, just to take a step back and sort of highlight the facts of what was going on here, is when you have senior employees, division heads, the head of the facility coming into locations where they're usually not going, coming in at unusual times. For example, they were coming on the night shift, so you'd have an unfamiliar senior manager coming in at midnight, interacting with employees in part by handing out these flyers and then watching the employee. The board found that that entire course of conduct constituted unlawful surveillance and was coercive. The board did not single out the flyer aspect of that. And that's why, as we argue in the brief, I think the Section 8C argument is sort of in opposite here. I'd also note that, as we note in the brief, the employer did not raise this to the board. And, in fact, we submit it's jurisdictionally barred by Section 10E because the employer did not even argue this during the board proceedings. I'm going to put aside preservation just to tie this down. The discussion of 8C in this footnote, it's a little bit murky, but they don't say that the leafleting was done by managers who were oddly out of place and they're in weird hours. In which case, you know, maybe the leafleting collapses into the concern about unusual practices. What they said was the employers may not place employees in a position where they must make an observable choice between support for unionization and opposition. And that's in the context of this concern about managers reporting back on how employees are reacting. So it seems to be saying there's a problem with one-on-one leafleting because the employer can observe the reaction of the employees. Well, I think what the board was doing in that footnote was noting in response to Member Ring that the finding here is consistent with prior board precedent, including what you just cited, Your Honor. But I'd note that impliedly, this entire discussion is in the context of the out-of-the-ordinary unlawful surveillance because the board did not make a separate finding. If you look at the board's conclusions of law or its remedial order, which is before the court, they did not prohibit the employer from leafleting. They prohibited the employer from engaging in unlawful surveillance. True. The count is unlawful surveillance, and the ordering language doesn't break apart the leafleting aspect from the manager on duty program. So I would submit that, you know, if a future case, it was alleged and the board found that non-out-of-the-ordinary leafleting was at issue, you know, that would be an interesting question, or an issue to litigate in that case. But in this particular case before the court, I think all that the board ultimately found was that this entire course of conduct was unlawful. Suppose, just for the sake of argument, suppose there's preservation on the 8C issue, and suppose I conclude, we conclude that the board's finding is fine as applied to manager on duty, not fine as applied to leafleting. Can we unpack those two? Is there sufficient evidence that the manager on duty aspect of it would independently support the finding and that that's what the board would want? I think so, Your Honor. I think that was the thrust of the board's finding. In fact, I think I would submit the strongest evidence here is not the leafleting, but the credited testimony of Ms. Golden, who was a manager present at all of these behind-the-scenes meetings. And contrary to what my opponent has argued, Mrs. Golden's testimony was very clear that the entire purpose of this change in policy was to target the union campaign and to see if employees were discussing, having group conversations, to see if they became quiet when managers approached, and to report back on individual employees and what their union sympathies might be. So even without the actual flyer aspect, I think that's merely reinforcing the fact that this was not a legitimate business decision. It was targeting the union in an out-of-the-ordinary way that would at least have a reasonable tendency to coerce employees, which is the standard for an 8A1 violation. I'd also note, just responding to something that came up earlier, the question of this July email with Mr. Weir. If the court actually looks at that email, the entire email is about how they're worried that the union campaign had started at the facility and he was reporting to the employer's corporate parent. And part of that email, he said he had already tried to get ahead of it by going around the facility to try to take the temperature of the employees. So there's no evidence at all that there was this quote-unquote manager on duty program that existed prior to the union. And as Ms. Golden's testimony makes clear, the timing as employees testified when they noticed this change, it was all in response to the union campaign and the employers never presented a legitimate basis for what it was doing, having senior managers come in at midnight in unfamiliar units where they could not assist the employees. In fact, there was testimony that their presence was very disruptive to patient care because they were just getting in the way of these nurses doing their jobs. If I could turn, if there aren't any further questions about surveillance, I could. Can we go? I'm not sure that the employer's purpose is really relevant or certainly insufficient, absent some finding on tendency to coerce. Well, it's true that this is a Section 81 violation, so motive is not a requirement of the violation. It's ultimately just an objective question of would this conduct have a reasonable tendency to coerce employees given the overall circumstances. And that question, with respect to various practices, particularly in campaigns, electoral campaigns, has been the subject of reversal and reestablish reversal and so with respect to certain practices because, as I understand it, that's a matter of judgment within the province of the board. That's correct, Your Honor. I think this is a fact-bound determination that's uniquely in the board's expertise in determining this. And I think this case is actually very similar to, for example, the Parsippany Hotel case where this court affirmed the board where you had a similar situation where during a union campaign the employer increased the number of guards at the facility who went around or observed employees in the workplace, some of which was in work areas just going about their daily duties, and the board in this court found that given the overall circumstances that would be coercive to employees and would constitute a violation. But my point is that had the board said that was not coercive, we would have also affirmed. Well, it would be a substantial evidence standard of review, which I think this entire case is. So the board could make a, you know, that's the standard of review. That's substantial evidence that something was not coercive? I don't think so. I think so because the standard is, you know, could a reasonable fact finder reach a particular conclusion based on this evidence? So the board may have reasonably found. Did you say something was substantial evidence that was not coercive? I mean, I guess the union would have standing to object to that, but I'm not sure what kind of presentation could possibly prevail. Well, I think it's substantial evidence that viewing these facts, there's a factual finding of how it would impact a reasonable employee, and that's something. It's a matter of actual employees saying they were coerced or were not coerced, correct? That's not the standard. You don't need to have actual coercion, although I would note in this particular case you did have testimony of employees who found this very unusual and, you know, abnormal. Mr. Weeks, do you think the board's finding on unlawful surveillance could be supported simply with Leonard's testimony, or do you need both? I mean, there are parts of the board's decision that seem to suggest that Leonard's, you know, testimony was sufficient. I think it probably would be sufficient. Obviously, here you have both, and as Your Honor noted earlier, the credibility of Ms. Golden is not disputed, but I think Ms. Leonard's testimony alone established the fact that these unusual high-ranking officials were coming in at unusual hours and employees found it strange in the context of this union campaign. I think Ms. Golden's testimony just really makes it beyond question, in my view at least, because she was present at the planning meetings where the employer discussed why it was doing all this and what it wanted the managers to do. But even if you didn't have that, which in a normal case you would not have a manager being so candid. There just seems some circularity with using Ms. Golden's testimony because, of course, the employer suggests that she was not really acting as a supervisor and not really, you know, acting on behalf of the employer, and so crediting, you know, her testimony about what was happening and why, you know, I do think there's some circularity problems there. Well, I mean, it was not really her testimony about, because she actually, as we can get to the discharge if you'd like, but she refused to do this, but her testimony, what was so persuasive, I think, is she was testifying about the group meetings where the employer and the union of ordinance consultants met with the managers and also individual meetings with her and explained what the purpose of this policy was and what the employer wanted the managers to do, to go throughout the facility and to observe employees and specifically about the union. But, again, I would just emphasize that the employer has never challenged her credibility as a witness, even if she may have conflicting interests in this case, obviously. Can we talk about the ND supervisor issue? It seems to me a close question, but the board's rationale seems a little hard to defend. The board said that the assigning tasks did not involve independent judgment because there was no objectively wrong answer to the decisions, and, relatedly, everyone on staff of the CSS employees were capable of performing all the tasks. I would think those considerations tend to prove that there was independent judgment. If there's a clearly wrong answer, you know, you're just doing math or something. That's not independent judgment. I think the point that the board— Independent judgment is, you know, there's no obvious answer. You know, we write difficult opinions, and the majority might be right. The dissent might be right. The open-ended, debatable nature of the decision is exactly what proves that there's independent judgment. I think that's absolutely right, Your Honor, and I think the board was making a separate point because it's also a principle under board law that if the outcome is obvious, for example, you have one employee who can do a particular skill, that is not independent judgment. I think the point the board was making here, specifically in contrasting this case with Oakwood Healthcare, for example, just as an illustrative example, that was a case where you had a charge nurse at a hospital, and the decisions that the charge nurse was doing in matching patients to nurses based on skills and a plethora of factors could have life-and-death decisions. These are significant discretionary calls that the supervisor has to make. Obviously, supervisory authority doesn't need to rise to that level, but independent judgment is a question of degree where the board makes discretionary determination. Was this independent judgment sufficiently important? Did it require sufficient evaluation of data or supervisory consideration to rise to the level of to deny someone all of their rights under federal law? What the board was saying here is that the decisions that Mr. Endy made when he was assigning employees were very routine and mundane because all of these employees have the same training. They're all capable of performing the handful of regular postings that they're de facto rotated between, and so there wasn't any supervisory meaningful choices that he had to make because he simply took into account preferences, whether employees had been in a particular assignment too often recently. He made an obvious choice, which I think goes to Your Honor's point, where if you had a female employee, he would make sure that they were assigned with a more senior coworker when they were assigned to the unit where you potentially had sexually violent patients. Well, was that a policy shared by all the others, or was that this individual's determination of what would be inappropriate? I don't know if there was testimony about what Ms. Cruz did or Mr. DeBrayeu, but I would submit that that's a sort of self-evident, obvious determination. And I'd also note that he did not – I don't know. I think somebody could equally look at that and say, gee, I'm not supposed to discriminate on the basis of gender, so I'm going to treat everybody alike. I mean, it's like they joined up for the Army, they joined up for this job. Well, I would note, Your Honor, that he didn't exclude any employees from this unit. He just made a sort of routine administrative call that I'm just going to make sure that that employee is paired with a more senior coworker when that situation arose. But again, I just – But that may have been – all we know is that he did that. We don't know whether that was – whether it was routine and everyone else did it or it was his decision – his prudence that was led him to that. That's true, Your Honor. I would make an overall point in response to that question, which is just to highlight to the Court that this entire inquiry, the employer has the burden of proof. And for some of these factors, the Board and the ALJ noted that really the determination was based on the fact that the evidence just wasn't conclusive, which is the employer did not satisfy its burden to show that he was exercising independent judgment. And I'd also note that it's certainly true that Mr. Endy exercised some discretion, but this – the framework under Section 211, as the Supreme Court has pointed out, recognizes that you'll have lead employees. I think Mr. Endy is a quintessential lead employee who performed minor supervisory duties. That's separate from the question of whether their duties rise to the level to constitute – to satisfy the three factors under Section 211, including assignment with independent judgment. Why is that? The statute says assignment – assignment is a supervisory function. There's no dispute that he was engaged in assignment. And then the question of the independent judgment, the degree of difficulty, importance, open-endedness of those assignment decisions, they just are what they are. They don't turn on anything else he was or wasn't doing. Well, that's true, Your Honor, but I think it isn't necessarily a discretionary call of whether this particular – what the evidence shows, what was proven as to this particular assignment authority, whether that rises to the level of independent judgment, because certainly any kind of assignment where it's not written out for you in advance requires some discretion. But I think it's well established that if you're just doing something routine or administrative, as I think Mr. Endy was here, that that's not statutory supervisory authority. It's not sufficient to deny someone all of their protections under federal law. And as this Court has recognized, and as we cite in our brief, this Court has held that that's uniquely within the Board's expertise and that the Court affords additional deference to that determination. One theory that you might – the Board might have pressed but didn't is the one I was asking your friend about, which is these assignments were a very small fraction of Endy's overall shift. Is there some reason why the Board did not stress that? I know, Your Honor, there is a doctrine – I don't want to misstate what it is since it wasn't litigated – where a supervisor can be performing supervisory duties on such an ad hoc basis that it's not sufficient. I think perhaps the Board here didn't go that route because this was admittedly a regular part of Mr. Endy's duties. He did this on a regular basis. And courts have held that any – you know, as long as you have the authority and exercise it on some occasion, that can be sufficient. And so I think the Board didn't need to get into Your Honor's point because they found on the threshold that what he was doing wasn't supervisory at all, regardless of how much time it took. I would make a factual – So you're comfortable with us deciding the supervisor question just looking at what he was doing during those 15 minutes or 45 minutes or whatever it was? I think, yes, you could have supervisory assignment authority even if it wasn't a – you could have a more limited duration and it could still constitute supervisory assignment. I would just make a factual clarifying point here, Your Honor, since there was some discussion about the time that it took. I think Ms. Cruz testified that on the long end it would be 30 minutes. The Board credited the idea as 15 minutes. I think Mr. Endy actually testified it was even less. And Ms. Cruz, when she noted it was 30 minutes because of the call-outs, that was because she was essentially waiting for employees to arrive and that could take a while. It wasn't because she was sitting down deliberating for 30 minutes. So are there any further questions about – What was the case you referred to when you used the phrase making life – I presume metaphorically life and death decisions? Well, that was Oakwood Health Care. I think it was a literal determination there. The employer cites Oakwood as supporting its position here. But that case involved charged nurses at a hospital. And as patients came in, they had to assign patients to particular nurses based on that patient's issues, based on the nurse's skill, based on a myriad of factors. And that's why the Board found supervisory authority there, which is very different than – And the CSS line people are more like orderlies, I assume. Exactly. They're not medical professionals. They all receive the same very basic training, and they are essentially orderlies, and they patrol the building or observe people and have some sense of enforcing security. If there aren't any further questions about Mr. Endy or any of the other disputed unfair labor practices? I think we are good, so thank you very much. We'd ask for full enforcement. Thank you. Rebuttal? Rebuttal. Let's start with those life-or-death decisions. There is certainly a possibility of a life-or-death decision when you assign the wrong person to deal with a violent patient in the MBI unit. There's certainly the possibility of a life-or-death decision when you assign the wrong person to entertain one of the brain-injured patients down below, and it gets them more agitated and upset than helping them. I understand these aren't nurses, but there is the same considerations of can this person do this job, can they be with this person, can they handle them all night. It's not the case. There is a difference in degree, right? Well, there's a difference in skill set. I don't know if there's a difference in degree. You know, a nurse is a nurse. A nurse can perform all of their nursing functions. If we're talking about the only renal care nurse being assigned to the only renal care patient, there's no discretion there. I would argue there's more discretion here, where we're talking about employees having to match closely with the patients that they're caring for. There was no policy that excluded women from working alone at MBI, and, in fact, the records which start on A622 will show Josie Cruz worked alone in MBI as a female employee. There were others. I think Anita Rogers worked alone in MBI as a female employee. There's no policy that they couldn't. Mr. Endy said he preferred not to, and he didn't find it to be the most productive. That's okay. That's his discretion and judgment. But it wasn't the case that nobody had that. I think it's important, A169, Josh Endy testified they had tried a strict rotation, where employees simply were rotated and it did not work. They went back to having the supervisors make those decisions. I think that only shows that there had to be discretion. I would also point out that while the judges declined to consider it, he did also issue discipline to employees, including doing third-step write-ups all on his own, and that's in the record. In terms of the outside the chain of command, I think it's important. These were not the people from corporate that came in and started running around. These were people employed at the facility. Now you're back to surveillance. Yeah. The department heads were not outside the chain of command. Their employees were working when they were there on these units. Their employees work throughout the building. They just may not have been assigned to a particular unit. I see that I'm out of time. Judge Ginsburg. Judge Rafferty. Thank you. Thank you.
judges: Katsas, Rao, Ginsburg